**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.

**JALEEL DUNLAP,**

      **Defendant.**

:

:

:

**Case No. 2:23-cr-94
Judge Sarah D. Morrison**

## OPINION AND ORDER

This matter is before the Court on Defendant Jaleel Dunlap's Motion to Suppress Evidence (Evid. Mot., ECF No. 21) and Motion to Suppress Statements (Stmt. Mot., ECF No. 22). The Government filed an Omnibus Opposition in response. (Resp., ECF No. 28.) For the reasons set forth below, both Motions are **DENIED**.

**I.**    **BACKGROUND**

    **A.**    **Traffic Stop**

On March 9, 2023, Task Force Officer ("TFO") Joshua Wright was surveilling an apartment complex in Columbus when he observed a silver Chevy Malibu sedan with license plate JYA 2069 "pull into the rear" of the complex. (Evid. Mot., PAGEID # 50; Resp., PAGEID # 73; *see also* Resp., Ex. 1.) TFO Wright photographed a Black male as he exited the apartment building, approached the sedan, took money from his pocket, and exchanged something with the passenger in the sedan. (Resp., Exs. 2–4, 7–9.) Suspecting he had just witnessed a narcotics

transaction, TFO Wright radioed two officers (Lautner and Duncan) with the Columbus Division of Police ("CPD") and alerted them of his suspicion. (Evid. Mot., PAGEID # 50; Resp., PAGEID # 73.)

After hearing from TFO Wright, Officer Lautner provided Officer Duncan with exemplary dialogue to say to the occupants of the sedan. (Resp., Ex. 10 ("Lautner Bodycam"), 0:01–1:05 ("Hey man, just so you're aware … I know where you just came from, I got K-9 in route, you know … is there anything in your car that you want to let me know about?").) Officer Lautner then asked Officer Duncan if he had "ever done a conversation like that with these … for like a dope stop? For like a, hey we want information." (*Id.*) Officer Lautner expressed that if Officer Duncan had not had such a conversation, Officer Lautner would let him "take lead" to "get some experience." (Resp., Ex. 11 ("Duncan Bodycam"), 0:40.) Officer Lautner also called for a K-9 unit. (Lautner Bodycam, 1:15.)

TFO Wright then radioed more information about the sedan: "Yeah, I think this uh, this dude in the Malibu is gonna be the [] supplier … Not gonna be able to follow, you guys are gonna have to get close, [it's] backing out to the dumpsters now." (Lautner Bodycam, 1:16–1:37.) The officers pulled away from the curb and began looking for the sedan as TFO Wright continued to describe the sedan, its passengers, and its route over the radio. (*Id.*, 2:26.) TFO Wright relayed that the sedan had "real dark tinted windows." (*Id.*, 2:27.)

Moments later, the officers located the sedan, and they pulled over to wait for it to pass them. (*Id.*, 2:30–3:08.) After the sedan passed by, Officer Lautner got out

2

of the cruiser to confirm the license plate. (*Id.*, 3:21–3:30.) As the sedan left the intersection, Officer Lautner got back in the cruiser and told Officer Duncan that the sedan "rolled" the stop sign, stating: "So window tint and he rolled the stop sign." (*Id.,* 3:31–3:41.) Neither Officer Lautner's footage nor any other footage before the Court affirmatively shows whether the sedan did in fact roll the stop sign.

The officers pursued the sedan for a short distance before pulling it over. (Lautner Bodycam, 3:42–4:12.) The officers approached both sides of the vehicle and saw a female driver and Mr. Dunlap in the passenger seat. (*Id.*, 4:35.) Officer Lautner described the rolling stop and the window tint to the female driver as the reasons for the stop. (*Id.*, 4:35–5:56). After hearing from the driver that she recently got the windows tinted, Officer Lautner tested the tint of the sedan's driver's side window and told the driver that the meter was showing a 4% tint, which was "an illegal tint." (*Id.*, 6:30–7:34; *see also* Resp., Ex. 14 ("Unit 104 Bodycam"), 3:48–4:00.) Although the face of the meter showing the result was not captured on any footage, the footage does show that the sedan's windows were tinted such that someone looking at it from the outside could only see the reflection of the officers and not the inside of the sedan.

After explaining the tint results, Officer Lautner told the driver that he smelled "the odor of burnt marijuana" coming from the sedan and asked when they last smoked. (Lautner Bodycam, 7:40–7:48.) The driver responded that she and Mr. Dunlap smoked "about two hours ago."[1] (*Id.*, 7:50.) Officer Lautner told her that he

---

[1] The driver also showed Officer Lautner a clear plastic bag, which the Government asserts contained "blunts" (marijuana cigarettes). (Resp., PAGEID

3

had called a K-9 unit because of the odor, but he later canceled it. (*Id.*, 7:58, 10:24.) The officers removed the driver and Mr. Dunlap and proceeded to search the sedan. (*Id.*, 8:34–9:50). They found a fanny pack containing crack cocaine, methamphetamine, and fentanyl under the passenger seat, as well as cash, marijuana, and a scale. (*Id.*, 23:20–23:55; 25:55–26:10.)

The officers arrested Mr. Dunlap and the driver. (Lautner Bodycam, 37:18, 39:44.) As he was being arrested, Mr. Dunlap told the officers that the driver was "not involved" with the drugs and yelled the same to the driver. (Unit 104 Bodycam, 11:55.)

### B. Post-Arrest Statements

The officers took the driver and Mr. Dunlap to the CPD Headquarters, where Mr. Dunlap was detained for at least 42 minutes, outstretched on the bench and appearing to sleep, until TFO Wright entered the room. (Resp., Ex. 15 ("Wright Footage"), 0:00–42:10.) After introducing himself, TFO Wright asked Mr. Dunlap for his personal information and arrest history. (*Id.*, 43:08–45:03.) TFO Wright stated that Mr. Dunlap was "kinda f*cked right now" and that the government was looking to "hammer" people who were involved with drugs. (*Id.*, 45:47.) TFO Wright told Mr. Dunlap that he had "the ability to do some different stuff." (*Id.*, 45:58.) He observed that Mr. Dunlap had "a kid on the way and a little one at home" so he did not "need to go sit down [go to prison] for a while." (*Id.*, 46:12.)

---

# 77.) The Court cannot discern the bag's content from the footage, but the driver did identify the bag and say "This is what it is right here" when discussing the marijuana odor. (Duncan Bodycam, 8:10; Unit 104 Bodycam, 4:28.)

4

Before continuing, TFO Wright read Mr. Dunlap his *Miranda* rights. (Wright Footage, 46:25.) When asked what the rights meant to him, Mr. Dunlap responded, "If I don't want to talk, I don't have to." (*Id.*, 47:05). Mr. Dunlap then signed an acknowledgement of his understanding. (*Id.,* 47:24.) TFO Wright continued: "So listen, I'll be straight up with you, my goal is for you to cooperate with me so I can let you leave and go from there." (*Id.*, 49:09.) TFO Wright asked Mr. Dunlap about what was exchanged at the apartment complex, and Mr. Dunlap answered, "some hard," then clarified that he meant "crack." (*Id.*, 50:02–50:08.) A few seconds later, Mr. Dunlap requested an attorney. (*Id.*, 51:00.)

The interaction between Mr. Dunlap and TFO Wright lasted less than 20 minutes. During this conversation, TFO Wright explained to Mr. Dunlap that "you're not f*cking El Chapo, I'm not trying to like bang [] hit search warrants at your crib." (*Id.*, 50:40.) He also stated that he is "focused on narcotic trafficking" and that his "goal is for you to assist me in getting the people that are doing the shootings and have all the guns." (*Id.,* 51:28–51:41.) Nothing in the record indicates that TFO Wright or any other officers conducted any further questioning of Mr. Dunlap.

## II.  EVIDENTIARY HEARING

Mr. Dunlap requests an evidentiary hearing on both Motions. "A litigant is not always entitled to an evidentiary hearing." *United States v. Lawson*, 476 F. App'x 644, 648 (6th Cir. 2012). Rather, "[a] defendant must make at least some initial showing of contested facts to be entitled to such a hearing." *Id.* (quoting

5

*United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988)). Courts should grant evidentiary hearings on motions to suppress "when the defendant alleges sufficient facts which if proven would justify relief." *United States v. McGhee*, 161 F. App'x 441, 444 (6th Cir. 2005) (citation omitted). "In all events, however, a district court can forgo conducting an evidentiary hearing if sufficient content remains to support a finding of probable cause after the contested items are set aside." *United States v. Thompson*, 16 F. App'x 340, 344 (6th Cir. 2001).

Mr. Dunlap does not explicitly contest any factual issues in his motion to suppress the evidence obtained because of the traffic stop and subsequent vehicle search. Rather, he argues that the officers "decided to justify" the traffic stop with "*alleged* violations of the traffic code that were *conveniently missed* on bodycam footage." (Evid. Mot., PAGEID # 56–57 (emphasis added).) Even if the Court assumes from this language that Mr. Dunlap disputes whether there were traffic violations, this would not affect the legality of the stop. *Thompson*, 16 F. App'x at 344 ("A district court is required to hold an evidentiary hearing when the defendant has set forth contested issues of fact that bear upon the legality of the search."). A traffic stop is justified when an officer has probable cause to believe that a traffic violation has occurred or was occurring—not only when a violation did in fact occur. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), *cert. denied*, 520 U.S. 1178 (1997).

In addition, Mr. Dunlap offers no factual support for his implied assertion that there were no traffic violations. This is against evidence including the dark

6

window tint visible on the officers' bodycam footage and the fact that the driver paid a fine stemming from the traffic violations. (*See, e.g.*, Lautner Bodycam, 3:21–3:30; Resp., Ex. 12.) Considering this evidence, Mr. Dunlap's standalone suggestion that the officers did not have probable cause to effectuate the stop has not created a sufficient factual issue necessitating an evidentiary hearing.

Mr. Dunlap also does not contest any factual issues in his motion to suppress statements made during his interrogation. The motion, contending that the statements were involuntary due to police coercion, sets forth purely legal questions. *Cf. United States v. Hinds*, No. 18-20533, 2019 WL 7172090, at *1 (E.D. Mich. Dec. 23, 2019) (setting evidentiary hearing to determine factual issue of whether defendant was in custody for purposes of *Miranda*). Because the issues before the Court are "entirely legal in nature," the Court sees no need for an oral hearing. *See Lawson*, 476 Fed. App'x at 648–49.

Both requests for a hearing are **DENIED**.

### III.    MOTION TO SUPRESS EVIDENCE

Mr. Dunlap argues that the traffic stop was unlawful such that the resulting evidence should be suppressed as fruits of the poisonous tree. (Evid. Mot., PAGEID # 57.) He contends that the officers did not have probable cause to initiate the stop and that the stop was instead pretextual, as the officers planned to stop the sedan to search for evidence of drug trafficking rather than any violation of the traffic code.[2] (*Id.*, PAGEID # 55–56.)

---

[2] As a passenger, Mr. Dunlap has standing to challenge the lawfulness of the initial stop. *See Arizona v. Johnson*, 555 U.S. 323, 332 (2009).

7

The Fourth Amendment protects the "right of the people to be secure ... against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "It is well established that a police officer lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012); *see also United States v. Lyons*, 687 F.3d 754, 763 n.3 (6th Cir. 2012) ("[T]his Circuit applies the higher probable cause standard to traffic stops based on civil infractions, and the lower reasonable suspicion standard to traffic stops based on ongoing criminal activity."). Mr. Dunlap denies the existence of either. Because the Court concludes that probable cause existed to justify the traffic stop, there is no need to address the existence of reasonable suspicion.

### A. Probable Cause

When an officer has probable cause to believe that a traffic violation has occurred, the resulting traffic stop is not unlawful and does not violate the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also Bradshaw*, 102 F.3d at 210. Probable cause exists "where 'the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Bennett*,

8

905 F.2d 931, 934 (6th Cir. 1990). Determining the existence of probable cause "is fact-dependent and will turn on what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

A stop is reasonable if there was probable cause, and courts "focus not on whether a reasonable officer 'would' have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer 'could' have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred." *Ferguson*, 8 F.3d at 391. Establishing probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983).

If the officer has probable cause to believe that a traffic offense has occurred, the stop is permissible "regardless of whether this was the only basis or merely one basis for the stop." *Ferguson,* 8 F.3d at 391; *see also Whren,* 517 U.S. at 812–13. "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978); *see also United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002) ("[A]n officer's actual motivation for making a traffic stop is irrelevant to the constitutionality of that stop."). Pertinent here, "a traffic stop, supported by probable cause, of a vehicle as to which the officer

9

also has suspicions of more nefarious activity, is not unreasonable because it is based at least in part upon other motivations." *Ferguson*, 8 F.3d at 392; *see also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176, (2000) (explaining that pursuant to *Whren*, "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle").

Mr. Dunlap argues that the officers lacked probable cause to make the traffic stop and that the stop was instead pretextual. (Evid. Mot., PAGEID # 54–55.) But it is irrelevant whether the stop was pretextual—the relevant question is whether the officers had probable cause to stop Mr. Dunlap for a traffic violation. *See Bailey*, 302 F.3d at 656–57. Prior to the stop, TFO Wright alerted the officers that the car had "real dark tinted windows." (Lautner Bodycam, 2:30.) The officers waited to initiate the stop until they saw the sedan and the tint, in addition to the rolling stop. (*Id.*, 3:21–3:30.) Bodycam footage also confirms the obvious darkness of the tint. (*Id.*) This provided the officers with probable cause to stop the sedan to issue a traffic warning. Thus, even though the officers knew of TFO Wright's suspicion of a drug transaction involving Mr. Dunlap, it was constitutionally permissible for them to pull over the sedan because they had probable cause of a traffic code violation.

The evidence seized from the subsequent search of the sedan will not be suppressed as fruits of the poisonous tree because the stop was valid and because the search was reasonable under the automobile exception. *See Katz v. United States*, 389 U.S. 347, 357 (1967) (warrantless search presumptively unreasonable

10

unless exception applies); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The automobile exception allows an officer to perform a warrantless search of a detained vehicle when the officer has probable cause to believe the vehicle contains contraband or evidence of criminal activity. *Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). When probable cause is present for the automobile exception, police may search "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009).

Here, Officer Lautner notified Mr. Dunlap and the driver that he smelled burnt marijuana. (Lautner Bodycam, 7:40–7:48.) The driver confirmed that they had recently smoked marijuana. (*Id.*, 7:50.) The smell of marijuana emanating from the vehicle and its occupants is sufficient to establish probable cause to search the vehicle. *See United States v. Crumb*, 287 F. App'x 511, 513–14 (6th Cir. 2008) (collecting cases and explaining that "the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle"). The search was proper.

The Motion to Suppress Evidence (ECF No. 21) is **DENIED**.

IV.     **MOTION TO SUPRESS STATEMENTS**

Mr. Dunlap challenges the admissibility of his post-arrest statements to TFO Wright on the ground that they were obtained in violation of the Due Process Clause because they were not voluntarily made. (Stmt. Mot., PAGEID # 65–66.)

A defendant may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[A] suspect subject to custodial interrogation must first be given notice of his or her right against self-

11

incrimination." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("[A] suspect must receive a warning before custodial interrogation begins."). The ultimate inquiry into whether a person is in custody for purposes of *Miranda* is whether there was a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal citations omitted).

There is no dispute that Mr. Dunlap was in custody when he was questioned. To determine whether TFO Wright elicited inculpatory statements by unconstitutional means, the Court "looks to the totality of the circumstances concerning whether [Mr. Dunlap's] will was overborne." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999). When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary by satisfying three requirements: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *Id.* (internal citations omitted). When reviewing the totality of the circumstances for voluntariness, courts "look at the age, education, and intelligence of the defendant; whether the defendant has been informed of his Miranda rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *Michael v. Butts*, 59 F.4th 219, 228 (6th Cir. 2023) (internal quotation marks and citations omitted).

12

In this case, the Government has met its burden of demonstrating that TFO Wright's questioning was not objectively coercive. TFO Wright read Mr. Dunlap his *Miranda* rights before Mr. Dunlap made his statements, and Mr. Dunlap indicated he understood his rights. (Wright Footage, 46:25–47:24.) When a *Miranda* waiver has been obtained, a "confession is much more likely to be voluntary," and "when law enforcement has complied with *Miranda,* we 'rare[ly]' hold that a defendant was induced to make a coercive statement." (Resp., PAGEID # 79 (citing *Butts*, 59 F.4th at 228).)

Turning to the second and third factors, Mr. Dunlap is a 25-year-old high school graduate. (Wright Footage, 43:08–45:03.) Mr. Dunlap does not allege any diminished capacity or intellectual challenges. And, although Mr. Dunlap appears tired in the footage, TFO Wright spent less than 20 minutes with Mr. Dunlap and did not use or threaten physical punishment. To the contrary, Mr. Dunlap was allowed to rest, and the record only reflects one session of questioning in total.

Mr. Dunlap asserts that he was coerced to give his statements when TFO Wright told him that he did not "need to go sit down [go to prison] for a while" and that the "goal is for you to cooperate with me so I can let you leave and go from there." (Wright Footage, 46:12, 49:09.) According to Mr. Dunlap, these statements "implied that Mr. Dunlap was looking at imprisonment unless he cooperated with TFO Wright." (Stmt. Mot., PAGEID # 64.)

"A promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary." *United States v. Wrice*, 954 F.2d 406, 411

13

(6th Cir. 1992); *see also United States v. Johnson*, 351 F.3d 254, 261–62 (6th Cir. 2003) ("[P]romises of leniency can be objectively coercive if those promises are broken or illusory."). However, "promises to recommend leniency or speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *United States v. Delaney*, 443 Fed. App'x 122, 129 (6th Cir. 2011). Indeed, "such statements usually are permissible." *Id.* at 128 (citation omitted).

Here, after reviewing the footage of the questioning in full, the Court agrees with the Government that TFO Wright was requesting Mr. Dunlap's cooperation in identifying other individuals higher up the criminal chain. (Wright Footage, 50:40–51:41 (saying he is "focused on narcotic trafficking" and that his "goal is for you to assist me in getting the people that are doing the shootings and have all the guns").) Had Mr. Dunlap chosen to cooperate as an information, "release from detention was a potential option." (Resp., PAGEID # 78.) Ultimately, TFO Wright's statements to Mr. Dunlap were not coercive, and Mr. Dunlap's statements were thus voluntary.

The Motion to Suppress Statements (ECF No. 22) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

14